Monica S. Call (#11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone: (801) 328-3131
Facsimile:  (801) 578-6999

Daren S. Garcia (*pro hac vice application forthcoming*)
dsgarcia@vorys.com
Rodney A. Holaday (*pro hac vice application forthcoming*)
raholaday@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
Telephone: (614) 464-8356
Facsimile:  (614) 719-5112

Attorneys for Skullcandy, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SKULLCANDY, INC., a Delaware corporation, | |
| Plaintiff, | Case No:  2:18-cv-00749-DN |
| v. | **COMPLAINT** |
| CHRIS MIN-WOO PARK, an individual doing business as "CnD Online" (f/k/a "Karl's PriceKuts," "Smarter Savings," and "Northern Distributors") on www.amazon.com, and JOHN DOES 1-10, | **JURY DEMANDED** |
| Defendants. | |

Plaintiff Skullcandy, Inc. ("Skullcandy") brings this action against Defendant Chris Min-Woo Park ("Park") (doing business as "CnD Online" f/k/a "Karl's PriceKuts," "Smarter Savings," and "Northern Distributors" on the website www.amazon.com ("Amazon")) and John Does 1-10 ("Doe Defendants") (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement; deceptive trade practices in violation of Utah Code Ann. § 13-11a-3, unfair competition in violation of Utah Code Ann. § 13-5a-102, and tortious interference with contracts. These claims arise out of Defendants' misappropriation of Skullcandy's trademarks in connection with Defendants' unlawful and unauthorized sale of Skullcandy®-brand products on the Internet, including the sale of materially different and non-genuine products bearing Skullcandy's trademarks that are not subject to, do not abide by, and interfere with Skullcandy's quality controls. In support of its complaint, Skullcandy alleges as follows:

## **PARTIES**

1.     Skullcandy is a corporation, organized under the laws of the State of Delaware, with its principal place of business located in Park City, Utah.

2.     Park is an individual who, on information and belief, resides in Victoria, Australia, at 40 Rothbury Parkway, Williams Landing, Victoria 3027, Australia and may be served with process there or anywhere else he may be found. Park does business throughout the United States through an online storefront on Amazon called "CnD Online," which was previously called "Karl's PriceKuts," "Smarter Savings," and "Northern Distributors."

3.     The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of the Doe Defendants are unknown to Skullcandy.  Therefore, Skullcandy sues these Doe Defendants by a fictitious name.  Skullcandy is informed and believes, and on that basis alleges, that each of the Doe Defendants is responsible in some manner for the events and occurrences referred to herein or otherwise interested in the outcome of the dispute.  When the true names, involvement, and capacities of these parties are ascertained, Skullcandy will seek leave to amend this Complaint accordingly.

## **JURISDICTION**

4.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Skullcandy's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Utah are substantially related to its

federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

5.     This Court has personal jurisdiction under the Due Process Clause because Defendants have expressly aimed tortious activities toward the State of Utah and established sufficient minimum contacts with Utah by, among other things, advertising and selling infringing Skullcandy products to consumers within Utah through one or more highly interactive commercial websites with the knowledge that Skullcandy is located in Utah and is harmed in Utah as a result of Defendants' sales of infringing Skullcandy products to Utah residents.  Defendants have known that Skullcandy is located in Utah, among other reasons, because they have received cease-and-desist letters that identify Skullcandy as a corporation located in Utah and because the Skullcandy products they are selling identify Skullcandy as a company located in Park City, Utah.  Skullcandy's claims arise out of Defendants' sales of infringing Skullcandy products to Utah residents.

## **VENUE**

6.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Skullcandy's claims occurred within this judicial district or, in the alternative, because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

**A.   Skullcandy and Its Trademarks**

7.     Skullcandy develops, manufactures, markets, and sells headphones and speakers.  Skullcandy sells its products through its own website and also through its network of Authorized Distributors and Authorized Resellers (collectively, "Authorized Dealers").

8.     Skullcandy devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation. By distributing products exclusively through its own website and its Authorized Dealers, Skullcandy is able to ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Skullcandy brand.  In the highly competitive audio electronics market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

9.     To promote and protect the Skullcandy brand, Skullcandy has registered numerous trademarks with the United States Patent and Trademark Office with respect to its brand and products, including but are not limited to, SKULLCANDY® (U.S. Trademark Registration Nos. 3,381,050, 3,726,304, 3,788,707, 3,168,695, 4,396,791, 4,622,094, 4,724,445, 5,166,615, and 5,215,305), CRUSHER® (U.S. Trademark Registration No. 4,573,153); INK'D® (U.S. Registration No. 3,506,161); METHOD® (U.S. Trademark Registration No.

4,800,154); BARRICADE® (U.S. Trademark Registration No. 5,120,775); and SMOKIN' BUDS® (U.S. Trademark Reg. No. 4,695,063); (collectively, the "Skullcandy Trademarks").

10.    The registration for each of the Skullcandy Trademarks is valid, subsisting, and in full force and effect.

11.    Skullcandy filed the SKULLCANDY® trademark on January 10, 2006, and it was registered on November 7, 2006.  Skullcandy has actively used the SKULLCANDY® trademark since that time.

12.    Skullcandy actively uses, advertises, and markets all of the Skullcandy Trademarks in commerce throughout the United States.

13.    Skullcandy was founded in 2003 and has advertised, promoted, and sold products in interstate commerce under the Skullcandy name and trademark since that time.  Examples of the types of products sold under the Skullcandy name and trademark are depicted below:


CRUSHER WIRELESS HEADPHONE
$199.99


HESH 3 WIRELESS HEADPHONE
$129.99


HESH 2 WIRELESS HEADPHONE
$99.99

14.    Consumers recognize the Skullcandy Trademarks as being associated with high quality headphones and speakers in the audio electronics market.

15.    Consumers associate the Skullcandy Trademarks with the quality and innovation of Skullcandy's products, which have been remarkably consistent and dependable since the company's founding in 2003.  For the past 15 years and counting, Skullcandy has committed to taking all possible measures to guarantee high quality, innovative, and long-lasting products.

16.    The Skullcandy name is also well known for its commitment to counterculture and self-expression.

17.    In 2008, Fortune Magazine praised Skullcandy products as "the world's coolest ear bud."  *See* Michael Copeland, *The world's coolest ear buds*, FORTUNE MAGAZINE (Dec. 8, 2008), http://archive.fortune.com/2008/12/30/technology/copeland_skullcandy.fortune /index.htm.

18.    For all of these reasons, the Skullcandy Trademarks are widely recognized by the general public of the United States, and Skullcandy is widely recognized as the source of products bearing the Skullcandy Trademarks.

19.    Due to the superior quality and exclusive distribution of Skullcandy products, and because Skullcandy is uniquely recognized as the source of these high quality products, the Skullcandy Trademarks have substantial value.

**B.    Online Marketplaces and the Challenges They Present to Skullcandy Product Quality**

20.    E-commerce retail sales have exploded over the past decade.  From 2007 to the beginning of 2018, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.1% to 9.1%. *See* Stefany Zaroban, *U.S. e-commerce sales grow 16.0% in 2017*, DIGITAL COMMERCE 360 (Feb. 16, 2018) https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-156-2016/; *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (May 17, 2018), https://fred.stlouisfed.org/series/ECOMPCTSA.

21.    In 2017, consumers spent $453.46 billion on e-commerce sales, a 16% increase from 2016.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2017 United States consumers spent $189.61 billion in e-commerce sales on Amazon, a 30.1% increase from 2016.

22.    While the online marketplaces have created a great deal of opportunity, they also challenge a manufacturer's ability to control the quality and safety of its products.

23.    For example, consumers who purchase products through the online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different example if the one they choose is damaged or has

been tampered with.  Instead, consumers must trust that the product they select over the Internet will arrive in the same condition and quality they expect and typically receive from the manufacturer.

24.    The online marketplaces also allow third parties to sell products anonymously, without the third parties disclosing their true identities to consumers. Accordingly, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell them on online marketplaces without having to reveal his or her identity to the consuming public.  This prevents the manufacturer and consumer from reaching sellers, like Defendants, to address quality concerns.

25.    Unauthorized sellers commonly sell diverted products that are well past their expiration date or mix fake or diluted products in shipments to unwitting consumers.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the 'gray market'*, (Sept. 8, 2016), https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know that consumers trust marketplaces and assume that the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes* (Nov. 28, 2016, 7:00 AM), https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

26.     Because diverters, like Defendants, operate anonymously on marketplaces and undertake great measures to maintain anonymity, manufacturers have no ability to exercise their quality controls over the products sold by the diverters or to ensure that these products are safe.  A manufacturer's inability to exercise control over the quality of its products presents serious health and safety risks.

27.     Online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity because online marketplaces' construction and user interfaces suggest that all sellers on the marketplaces are all selling the same product when—as is the case here—they are not.

28.     When purchasing products on an online marketplace, customers cannot easily distinguish between a manufacturer's authorized and unauthorized sellers.  Indeed, on some online marketplaces, all sellers are listed under one product listing, making it practically impossible for consumers to ascertain which sellers are authorized and subject to the brand's quality standards and which sellers are selling unauthorized products outside of the manufacturer's quality controls. Unlike brick-and-mortar channels where a consumer can select another product from the shelf when the initial product selected appears to be of compromised quality, online-marketplace consumers must trust that the product appearing on their doorstep meets normal quality standards.  This reality requires manufacturers

to implement quality control-programs tailored to their online-marketplace channels to protect consumers and brand goodwill.

29.     When a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor-quality product, the customer is more likely to associate the problem with the brand or manufacturer rather than the anonymous seller.

30.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product he or she receives can post a review on the online marketplace for all other consumers to see.  These reviews, which are often permanently fixed, frequently criticize the brand or manufacturer of a product rather than the particular online-marketplace seller that sold the product.

31.     Product reviews on online marketplaces have a significant impact on a brand's reputation.  Survey results show that 82% of United States adults sometimes consult online reviews for information when they consider buying a new product online and 40% "always" or "almost always" consult such reviews. *See Online Shopping and E-Commerce: 2. Online reviews*, PEW RESEARCH CENTER (Dec. 19, 2016) http://www.pewinternet.org/2016/12/19/online-reviews/.

32.     Consumers place extraordinary trust in online reviews.  Indeed, consumers are over 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *See Moms Place Trust in Other Consumers*, EMARKETER (Feb. 10, 2010) https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

33.     Because of the reliance consumers place on online reviews, negative online reviews can sound the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  *See* Graham Charlton, *How many bad reviews does it take to deter shoppers?* (Apr. 12, 2011),    https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

**C.     Skullcandy Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Sellers, Like Defendants, That Did Not Abide By The Quality Controls that Skullcandy Requires Authorized Dealers To Follow**

34.     Brands are often victims of anonymous, unauthorized sellers on online marketplaces who cause consumers to post negative reviews that injure brands' goodwill and reputation.  Skullcandy has been the subject of negative online-marketplace reviews from customers who purchased products from sellers, like

Defendants, that did not abide by the quality controls that Skullcandy requires Authorized Dealers to follow.

35.     For example, on January 1, 2018, another customer, aida lopez, complained that she received a fake product: "First off these are not originals. I did a side by side the ones i bought from the actual company and noticed that they do not have original stamping like the ones i own. The sound quality of these are horrible and are made with very cheap material, i am returning them. Do not waste your money or time on these. Spend the extra dollars and get the real original ones."

**★☆☆☆☆ These are not ORIGINALS they are COUNTERFEIT!**
By aida lopez on January 1, 2018
Color: Black | Verified Purchase

First off these are not originals. I did a side by side the ones i bought from the actual company and noticed that they do not have original stamping like the ones i own. The sound quality of these are horrible and are made with very cheap material, i am returning them. Do not waste your money or time on these. Spend the extra dollars and get the real original ones.

▸ Comment  |  One person found this helpful. Was this review helpful to you?   Yes   No   Report abuse

36.     On February 7, 2018, another customer, Heyborne, complained that he received a fake product: "Update: After visiting a factory store I have confirmed the headphones in this listing are indeed fakes. The samples on display and the items on the shelves in the corporate store hold up to the originals I have owned for years. I have owned several pair of Ink'd 2. These are NOT the same. In fact, like other views, I have compared them side by side with a good pair and everything about these is garbage. The cord is no longer soft rubber, but 'plasticy' and

narrower. Everything looks and feels cheaper. The control button is barely staying together and the sound is hollow."

⭐☆☆☆☆ **Counterfeit items.**
By Heyborne on February 7, 2018
Color: Black | Verified Purchase

Update: After visiting a factory store I have confirmed the headphones in this listing are indeed fakes. The samples on display and the items on the shelves in the corporate store hold up to the originals I have owned for years.

I have owned several pair of Ink'd and Ink'd 2. These are NOT the same. In fact, like other reviews, I have compared them side by side with a good pair and everything about these is garbage. The cord is no longer soft rubber, but 'plasticy' and narrower. Everything looks and feels cheaper. The control button is barely staying together and the sound is hollow.

▸ Comment | 2 people found this helpful. Was this review helpful to you? [ Yes ] [ No ] | Report abuse

37.    On February 7, 2018, another customer, Ist, complained that he received a fake product: "OK… There is 'Made in China' and then there is a 'Chinese Knockoff.' This is the latter. These particular earbuds are SO poorly made that a toddler can make out the flaws and faults! Plastic pieces sticking out, filter falling out, buds not holding on… List goes on and on. I've also noticed that at first when purchasing these they never mentioned anything about them selling the earbuds 'used.' Now.. for some reason they are. Hmm.. Sketchy if you ask me."

⭐☆☆☆☆ **Buyer beware**
By Ist on February 7, 2018
Color: White/Black | Verified Purchase

OK… There is "Made in China" and then there is a "Chinese Knockoff." This is the latter. These particular earbuds are SO poorly made that a toddler can make out the flaws and faults! Plastic pieces sticking out, filter falling out, buds not holding on… List goes on and on.

I've also noticed that at first when purchasing these they never mentioned anything about them selling the earbuds "used." Now.. for some reason they are. Hmm.. Sketchy if you ask me.

▸ Comment | Was this review helpful to you? [ Yes ] [ No ] | Report abuse

38.    On March 4, 2018, another customer, Mr & Mrs Leal, complained that they received a broken product: "Broken on arrival. Mine arrived with no bluetooth function, won't ever be buying third party again."

⭐☆☆☆☆ **Broken on arrival**
By Mr & Mrs Leal on March 4, 2018
Color: Black | Verified Purchase

Mine arrived with no bluetooth function, won't ever be buying third party again.

39.    On April 4, 2018, another customer, Vbalan, complained that he received a used product: "Product came yesterday. There was a crack on the frame. Brown stains around the headphones. Especially obvious since it's matt [sic] white in color. Box looks old and chipped at a side. I honestly think i was given a Used pair Crushers. My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it."

⭐☆☆☆☆ **My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it**
By Vbalan on April 4, 2018
Color: Gray;Tan | Verified Purchase

Product came yesterday. There was a crack on the frame. Brown stains around the headphones. Especially obvious since it's matt white in color. Box looks old and chipped at a side.

I honestly think i was given a Used pair of Crushers. My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it.



40.    On August 31, 2018, another customer, Pa Lor, complained that he received a defective product: "Just unboxed it and tried to power it on like it says on the box but it didn't power on. No light or anything when I tried to charge it. I

let it sit on the charger for 20 minutes but there was still no light or power indicating that it was working."

⭐☆☆☆☆ **Came in Defective**
By Pa Lor on August 31, 2018
Color: Black | **Verified Purchase**

Just unboxed it and tried to power it on like it says on the box but it didn't power on. No light or anything when I tried to charge it. I let it sit on the charger for 20 minutes but there was still no light or power indicating that it was working.

41.     Upon information and belief, the foregoing complaints were made by consumers who purchased products from unauthorized sellers of Skullcandy products.

42.     Upon information and belief, some of the foregoing complaints were made by consumers who purchased products from Defendants and Skullcandy has been victimized by negative reviews such as the foregoing as a result of consumers purchasing poor quality Skullcandy products from Defendants.

**D.     Skullcandy Has Implemented Strict Quality Controls to Combat the Problems Presented by the Online Marketplaces and to Protect the Value of the Skullcandy Trademarks**

43.     Recognizing the safety risks to its consumers and the reputational damage caused by the illegal sale of non-genuine Skullcandy products by unauthorized sellers, like Defendants, who do not abide by Skullcandy's quality controls and peddle poor quality products to unsuspecting consumers, Skullcandy has implemented a quality control program that applies to both brick and mortar retail settings and online sellers with the twin aims of protecting consumers and protecting the value and goodwill associated with the Skullcandy brand.

44.    The goal of Skullcandy's quality control program is to ensure that consumers who buy Skullcandy products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the Skullcandy name, especially quality and safety.

45.    The program seeks to minimize the likelihood that poor quality products will reach consumers.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and unsafe products and also protects the value and goodwill associated with the Skullcandy brand.

46.    Skullcandy abides by its quality control requirements and requires its Authorized Dealers to abide by them as well.

47.    Skullcandy's ability to exercise its quality controls is essential to the integrity, safety, and quality of Skullcandy products, as well as the value of the Skullcandy Trademarks and other intellectual property.

**E.    Authorized Dealers May Sell Skullcandy Products Only Through Specific Channels and Must Adhere To Skullcandy's Quality Control and Customer Service Requirements**

48.    Skullcandy maintains its strict quality control over Skullcandy products by selling its products exclusively to customers directly or to Authorized Dealers.

49.     Skullcandy permits Authorized Dealers to sell Skullcandy products in specific channels only and requires Authorized Dealers to abide by applicable Skullcandy policies and rules relating to quality controls, customer service, and other sales practices (collectively, the "Skullcandy Rules").

50.     Authorized Dealers are permitted to sell Skullcandy products only to Authorized Retailers.  Skullcandy's policies define an "Authorized Retailer" as an individual or business that: (1) Skullcandy has approved as a seller of Skullcandy products; (2) purchases and resells products as part of an commercial enterprise, and is not an End User of Skullcandy products; (3) has agreed to follow the Skullcandy Rules, and (4) has not had its Authorized Retailer status revoked by Skullcandy.

51.     Authorized Retailers are permitted to sell Skullcandy products only to End Users.  The Skullcandy Rules define an "End User" as a purchaser of Skullcandy Products who is the ultimate consumer of the products and who does not intend to resell the products to a third party.  Authorized Retailers are strictly prohibited from selling Skullcandy products to any person or entity the Retailer knows or has reason to know intends to resell the products.

52.     Authorized Retailers are permitted to sell Skullcandy products to End Users on the Internet only if the products are sold on Permissible Websites. Among other requirements, the Skullcandy Rules require that "Permissible

Websites": (1) be operated by an Authorized Retailer in the Retailer's legal name or registered fictitious name; and (2) conspicuously state the Retailer's legal name, mailing address, telephone number, and email address (i.e., Authorized Retailers cannot sell products anonymously); (3) not use any third-party fulfillment service to store products or fulfill product orders, such that customers could receive products that did not come from the Authorized Retailer's inventory; (4) use only images of Skullcandy products that were supplied by or authorized by Skullcandy and keep all product descriptions accurate and up to date; and (5) comply with various privacy, accessibility, and data security laws, regulations, and industry standards.

53.    All Authorized Dealers (Authorized Distributors and Authorized Retailers) are prohibited from selling Skullcandy products on any third-party online marketplace—such as Amazon, www.ebay.com, www.walmart.com, and www.jet.com—without Skullcandy's prior written consent.

54.    The purposes of these restrictions are to ensure that Skullcandy knows who its Authorized Dealers are, which ones are selling online and where they are selling online, and how to immediately contact them in the event of any product quality issues.

55.    The Skullcandy Rules also require Authorized Dealers to adhere to Skullcandy's quality control requirements.

56.    To ensure that customers receive the genuine and high-quality products they expect from Skullcandy products, the Skullcandy Rules require that Authorized Dealers inspect all products for damages, defects, and other non-conformance and remove all such products from inventory.  Further, to assist Skullcandy in identifying any product quality issues, Authorized Dealers are required to report any defects to Skullcandy.

57.    The Skullcandy Rules also require that Authorized Dealers store products in accordance with guidelines issued by Skullcandy.  Importantly, for the safety of consumers, Authorized Dealers must store products in a cool, dry place, away from direct sunlight, extreme heat, and dampness and in accordance with applicable laws, rules, regulations, and any other storage guidelines specified by Skullcandy.

58.    To avoid consumer confusion and ensure that customers receive genuine Skullcandy products, Authorized Dealers are prohibited from relabeling, repackaging, or altering Skullcandy products.   Authorized Dealers are also prohibited from removing, translating, or modifying the contents of any label or literature on or accompanying Skullcandy products.  Further, Authorized Dealers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Skullcandy products, including lot codes, batch codes, and serial numbers.

59.     Skullcandy ensures that consumers receive safe products by requiring that Authorized Dealers assist with recalls and other consumer safety information efforts.  To allow it to detect counterfeit products, conduct recalls and disseminate other warnings about its products, Skullcandy places serial numbers on many of its products.  Skullcandy's serial numbers allow it to keep track of which specific products have been sold to a specific Authorized Dealer and alert Authorized Dealers if specific products ever need to be recalled or receive other attention.  The serial numbers also allow Skullcandy to determine which Authorized Dealer a specific product was sold to when a customer complains of poor quality and provides the serial number for the product at issue.

60.     The Skullcandy Rules also require that Authorized Dealers provide certain services to their customers.  For example, Authorized Retailers must familiarize themselves with the features of all Skullcandy products kept in their inventory.  This requirement ensures that Authorized Retailers are uniquely qualified not only to recommend the Skullcandy products best suited for end-user consumers' needs and well-being, but also to advise end-user consumers on how to use Skullcandy products safely and properly.

61.     Following the sale of genuine Skullcandy products, Authorized Retailers provide ongoing support to end-user consumers and are required to

provide expeditious customer service by responding promptly to consumer inquiries.

62.    If Skullcandy learns that an Authorized Dealer is selling Skullcandy products of poor quality or is otherwise not adhering to Skullcandy's quality controls, Skullcandy conducts an investigation to determine the source of the problem.  The Skullcandy Rules require that Authorized Dealers cooperate with Skullcandy's investigation and disclose all information about where they obtained Skullcandy products.  Based on what its investigation reveals, Skullcandy has the right to cease selling its products to Authorized Dealers and to terminate their status as Authorized Dealers.

63.    Skullcandy's quality control requirements are legitimate, substantial, and non-pretextual and have been implemented so that Skullcandy can control the quality of goods manufactured and sold under the Skullcandy Trademarks, which protects consumers and the value and goodwill associated with the Skullcandy Trademarks.

64.    Skullcandy's quality control requirements are also material because they are designed to protect consumers and prevent them from receiving poor quality products that could harm them or cause harm to Skullcandy's reputation and goodwill.

65.    Consumers consider it material and relevant to their purchasing decision to know whether a Skullcandy product is being sold by an Authorized Dealer that is subject to Skullcandy's quality control requirements or whether it is being sold by an unauthorized seller that is not subject to and does not abide by Skullcandy's quality controls and over whom Skullcandy is unable to exercise its quality controls.

**F.    Skullcandy Provides a Warranty Only For Products That Were Subject to its Quality Controls**

66.    Skullcandy provides a two year limited manufacturer's warranty (the "Limited Warranty") for all products sold to End Users by Authorized Retailers. The Limited Warranty provides that, if at the time of purchase a product contained a manufacturing defect or had been damaged by improper care prior to the time of purchase, Skullcandy will (i) repair, (ii) replace, or (iii) provide a Warranty Credit for the product for use on the Skullcandy online store.

67.    Skullcandy extends the Limited Warranty only to products that were sold by sellers that were subject to Skullcandy's quality controls and agreed to follow its quality controls.  Because products sold by unauthorized sellers are not subject to Skullcandy's quality controls and Skullcandy can therefore not ensure the quality of such products, the Limited Warranty is not available for Skullcandy products sold by unauthorized sellers.

68.     The Limited Warranty is a material element of genuine Skullcandy products.  Consumers purchasing Skullcandy products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Limited Warranty.

**G.     Defendants' Illegal Sale of Skullcandy Products on the Internet**

69.     To ensure that Authorized Dealers adhere to Skullcandy's quality control requirements and restrictions on authorized online sales, Skullcandy regularly monitors sales of its products on the Internet.

70.     In the course of this monitoring, Skullcandy discovered in November 2017 that products bearing the Skullcandy Trademarks were being illegally sold on Amazon through a storefront called "Northern Distributors."

71.     On information and belief, Defendants created the "Northern Distributors" Amazon storefront during or before November 2017 and began selling products bearing the Skullcandy Trademarks through the storefront thereafter.

72.     Defendants are not Authorized Dealers of Skullcandy products and do not comply with the Skullcandy Rules.

73.     Despite not being approved as Authorized Dealers, Defendants have sold, and continue to sell, products bearing the Skullcandy Trademarks through their Amazon storefront.

**H.      Defendants Do Not Abide By Skullcandy's Quality Controls and Customer Service Requirements**

74.      Defendants do not abide by Skullcandy's quality control measures that it imposes upon Authorized Dealers.

75.      Defendants do not comply with Skullcandy's quality control requirements because they have not provided Skullcandy their business information or given Skullcandy an opportunity to vet them to determine if they meet Skullcandy's high level of standards that it demands of its Authorized Dealers.

76.      Defendants do not comply with Skullcandy's quality control requirements because they sell products on their Amazon storefront anonymously. Defendants' storefront page does not include their business name, mailing address, or email address, or any other contact information.  In fact, as discussed in greater detail below, Defendants undertake great efforts to maintain anonymity and prevent anyone from contacting them regarding their business and poor-quality products they sell to unwitting consumers.  Defendants' concerted efforts at maintaining anonymity prevents Skullcandy from addressing any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Skullcandy Trademarks, such as the complaints discussed above.

77.      Defendants also do not comply with Skullcandy's quality control requirements because they have not disclosed to Skullcandy where they acquire

products that bear the Skullcandy Trademarks.  Accordingly, Skullcandy cannot determine if any products sold by Defendants are subject to a recall or consumer safety information effort.

78.    Defendants do not comply with Skullcandy's quality control requirements with respect to inventory because, upon information and belief, Defendants do not inspect the products they sell for damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Instead, upon information and belief, Defendants sell products bearing the Skullcandy Trademarks that are damaged or of otherwise poor quality.

79.    Defendants do not comply with Skullcandy's quality control requirements with respect to storage conditions because, upon information and belief, Defendants do not store their products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.

80.    Defendants do not comply with Skullcandy's quality control fulfillment requirements because, upon information and belief, they store their products at Amazon warehouses, they allow their inventory stored at Amazon's warehouses to be commingled with other sellers' inventory, and/or they keep no product inventory at all and solely order Skullcandy products from other online storefronts after customers purchase products from Defendants' Amazon storefront.  As a result, even if Defendants were to implement quality-assurance

procedures comparable to those that Skullcandy requires of Authorized Dealers, customers would not receive products that abide by those quality controls when purchasing Skullcandy products from Defendants.

81.    Defendants do not comply with Skullcandy's quality control requirements because, upon information and belief, they sell products as "new" that have been opened, returned and/or repackaged.  Upon information and belief, Defendants allow products that are returned to Amazon to be repackaged and placed back in their inventory as "new" products.  This results in consumers, who believe they are purchasing new Skullcandy products, actually receiving returned products of inferior quality.

82.    Upon information and belief, Defendants do not comply with Skullcandy's quality control requirements related to the handling, packaging, and shipping of products because Defendants sell products bearing the Skullcandy Trademarks that arrive damaged or defective.

83.    Defendants' failure to abide by the Skullcandy Rules prevents Skullcandy from exercising control over the quality of products Defendants sell bearing the Skullcandy Trademarks.  Skullcandy cannot audit Defendants to ensure they are complying with Skullcandy's quality controls and/or close Defendants' account for failing to comply with Skullcandy's quality control requirements.

84.     Defendants' failure to comply with the Skullcandy Rules also interferes with Skullcandy's quality controls because Skullcandy cannot obtain Defendants' assistance with any recall or consumer safety information efforts that may arise with respect to products sold by Defendants.

85.     Defendants also do not comply with Skullcandy's customer service requirements because they are not qualified nor have they been trained by Skullcandy to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on the safe and proper use of Skullcandy products.

86.     Defendants also do not comply with Skullcandy's customer service requirements because they do not, and are unable to, provide the ongoing support and responses to consumer inquiries that Skullcandy requires of its Authorized Dealers.

87.     Defendants do not comply with Skullcandy's customer service requirements because they do not take appropriate steps to address negative reviews from customers and do not cooperate with Skullcandy in investigating negative product reviews.

I.    **Defendants Are Infringing on the Skullcandy Trademarks By Selling
Products Bearing the Skullcandy Trademarks That Are Not Subject to,
Do Not Abide By, and Interfere With Skullcandy's Quality Controls
and Customer Service Requirements**

88.    For all of the reasons set forth above, the products Defendants sell
bearing the Skullcandy Trademarks fail to adhere to the extensive and legitimate
quality controls that Skullcandy exercises over products bearing the Skullcandy
Trademarks to protect consumers and its brand goodwill.

89.    The products sold by Defendants are not subject to, do not abide by,
and interfere with Skullcandy's quality controls and customer service
requirements.

90.    Defendants' unauthorized sale of products bearing the Skullcandy
Trademarks infringes on the Skullcandy Trademarks and diminishes their value.

91.    Because the products Defendants sell are not subject to, do not abide
by, and interfere with Skullcandy's quality controls and customer service
requirements, the products Defendants sell are materially different from genuine
Skullcandy products.

92.    The products Defendants sell are also materially different from
genuine Skullcandy products because they are not covered by the Skullcandy
Limited Warranty.

93.    Defendants' unauthorized sale of non-genuine products bearing the
Skullcandy Trademarks is likely to, and does, create customer confusion because

customers who purchase products from Defendants believe they are purchasing genuine Skullcandy products when, in fact, they are not.

94.     Despite these facts, Defendants have sold, and continue to sell, products bearing the Skullcandy Trademarks through their Amazon storefront without Skullcandy's consent.

95.     Upon information and belief, Defendants, through their storefront, accept and fulfill orders from Utah residents for products bearing the Skullcandy Trademarks and ship products bearing the Skullcandy Trademarks to persons located in Utah.

**J.      Skullcandy Has Repeatedly Attempted to Stop Defendants' Illegal Sale of Products Bearing the Skullcandy Trademarks but Defendants Continue to Willfully Infringe on the Skullcandy Trademarks**

96.     After Skullcandy discovered products bearing the Skullcandy Trademarks being illegally sold on the "Northern Distributors" Amazon storefront in November 2017, Skullcandy began investigating the storefront to determine who was operating the storefront.  The "Northern Distributors" storefront contained no contact information of any kind, and so Skullcandy had to spend significant time and money investigating the storefront to identify its operators.

97.     On or about December 11, 2017, counsel for Skullcandy sent a cease and desist letter to the "Northern Distributors" storefront via Amazon's messaging

system, demanding that the storefront's operators immediately cease selling products bearing the Skullcandy Trademarks.

98.   Skullcandy did not receive a response its letter, and the "Northern Distributors" storefront continued to offer products bearing the Skullcandy Trademarks for sale.

99.   On or about January 9, 2018, counsel for Skullcandy sent another letter to the "Northern Distributors" storefront via Amazon's messaging system. This letter warned that Skullcandy would take further action if the storefront did not immediately cease and desist selling products bearing the Skullcandy Trademarks.

100.   Skullcandy did not receive a response its January 9 letter, and the "Northern Distributors" storefront continued to offer products bearing the Skullcandy Trademarks for sale.  In the following months, however, the name of the storefront was changed from "Northern Distributors" to "Smarter Savings."

101.   In June 2018, counsel for Skullcandy received information through a subpoena that identified the operator of the "Smarter Savings" storefront as Chris Min-Woo Park, at a physical address of 40 Rothbury Parkway, Williams Landing, Victoria, Australia 3027 (the "Australia address"), and with an email address of amazon.vva@gmail.com.

102.   On or about June 12, 2018, counsel for Skullcandy sent another cease and desist letter to Park by email and by mail to his Australia address, demanding that Park immediately cease selling products bearing the Skullcandy Trademarks.

103.   Park did not respond to this letter, and the "Smarter Savings" storefront continued to offer products bearing the Skullcandy Trademarks for sale. In the following weeks, however, the name of the storefront was changed again— this time from "Smarter Savings" to "Karl's PriceKuts."

104.   On or about July 12, 2018, counsel for Skullcandy sent another cease desist letter to Park by email and by mail to his Australia address.  This letter also enclosed a draft complaint and indicated that a lawsuit would be filed if Defendant did not cease its infringement.  Once again, however, Skullcandy did not receive a response to its letter and the "Karl's PriceKuts" storefront continued to offer products bearing the Skullcandy Trademarks for sale.

105.   On or about September 6, 2018, counsel for Skullcandy sent another cease desist letter to Park by email and by mail to his Australia address.  This letter demanded that Park cease selling products the Skullcandy Trademarks and also warned him of his legal duty to not destroy relevant evidence in light of imminent litigation with Skullcandy.

106.   To date, Skullcandy has not received a response to its September 6 letter.  On September 12, however, the name of Defendants' Amazon storefront

changed once again from "Karl's PriceKuts" to "CnD Online," which remains the name of the storefront as of the time of filing.

107.   Through further investigation, Skullcandy discovered that Chris Min-Woo Park is affiliated with a registered business in Victoria, Australia called "C&D Online."  The close similarity of that name to the new name of Defendants' storefront—"CnD Online"—provides further assurance that Park is an operator of the storefront.

108.   As of the time of filing, Defendants' "CnD Online" storefront continues to offer for sale, and sell, non-genuine Skullcandy products.  As of the time of filing, the storefront is also exclusively selling Skullcandy products, demonstrating intent to uniquely harm Skullcandy.

109.   In addition to the investigation discussed above, Skullcandy also coordinated the purchase of more than 10 Skullcandy products from Defendants' Amazon storefront beginning in November 2017 and continuing into September 2018.  The purpose of these purchases has been to determine, by examining serial numbers on the products, which of Skullcandy's Authorized Dealers have sold products to Defendants in violation of their agreements with Skullcandy.

110.   Unfortunately, every single product that was purchased from the storefront (now called "CnD Online") has had its serial code obliterated.  Because of this defacement, Skullcandy cannot determine the source of the Skullcandy

products and would not be able to conduct a recall or other consumer safety information effort with the Skullcandy products sold by Defendants.

111.   For the reasons discussed above, the products Defendants sell are not genuine Skullcandy products, are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and are materially different from genuine Skullcandy products.

112.   Through their sales of products bearing the Skullcandy Trademarks, Defendants have misled, and continue to mislead, consumers into believing that they are purchasing genuine Skullcandy products when, in fact, they are not.

113.   Defendants' actions infringe on the Skullcandy Trademarks and diminish their value.

114.   Further, Defendants' disregard of communications from Skullcandy and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

115.   Defendants' Amazon storefront can be identified by viewing a "Merchant ID" that is included in the URL for the storefront.  The "Merchant ID" for Defendants' storefront is A2FUI40WEVPQV7.  Even when Defendants change the name of their storefront, the Merchant ID remains the same.

**K.      Defendants Are Tortiously Interfering with Skullcandy's Agreements
With Its Authorized Dealers**

116.   Upon information and belief, Defendants have purchased Skullcandy
products from Skullcandy Authorized Dealers for purposes of reselling them on the
Internet.

117.   The Skullcandy Rules prohibit Skullcandy's Authorized Dealers from
selling Skullcandy products to parties such as Defendants.   Specifically, the
Skullcandy Rules prohibit Authorized Distributors from selling products to anyone
except for Authorized Retailers.   The Skullcandy Rules prohibit Authorized
Retailers from selling to anyone except End Users.   Authorized Retailers are
strictly prohibited from selling Skullcandy products to third parties who intend to
resell the products.

118.   Defendants were informed of these prohibitions by at least December
11, 2017, when they received Skullcandy's first cease and desist letter.  Skullcandy
also repeatedly informed Defendants of these prohibitions in the many subsequent
letters it sent.

119.   Skullcandy's cease and desist letters also informed Defendants that, as
non-Authorized Dealers who were purchasing Skullcandy products from
Authorized Dealers for purposes of resale, they were causing a breach of the
agreements between Skullcandy and its Authorized Dealers and interfering with
Skullcandy's agreements and business relationships.

120.   Defendants were also advised that if they continued to acquire Skullcandy products from Skullcandy's Authorized Dealers for purposes of resale, they would be liable for tortiously interfering with Skullcandy's contracts.

121.   Despite being provided this information, upon information and belief, Defendants have continued to acquire Skullcandy products from Skullcandy's Authorized Dealers.

122.   Upon information and belief, Defendants willfully and knowingly induced unknown Authorized Dealers to breach their agreements with Skullcandy so that they could acquire Skullcandy products and resell them.

**L.     Skullcandy Has Suffered Significant Harm as a Result of Defendants' Conduct**

123.   As set forth above, the unauthorized sale of products bearing the Skullcandy Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the Skullcandy brand.

124.   When a consumer receives a poor quality, defective, counterfeit, or tampered-with product from Defendants, the consumer associates that negative experience with Skullcandy.  As a result, Defendants' ongoing sale of unauthorized products bearing the Skullcandy Trademarks harms the Skullcandy brand.

125.   Skullcandy has suffered and will continue to suffer significant monetary harm as a result of Defendants' actions including, but not limited to, loss

of sales, damage to its intellectual property, and damage to its existing and potential business relations.

126.   Skullcandy has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

127.   Skullcandy is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Skullcandy products, causing continued irreparable harm to Skullcandy's reputation, goodwill, relationships, intellectual property and brand integrity.

128.   Defendants' conduct was and is knowing, intentional, willful, malicious, wanton and contrary to law.

129.   Defendants' willful violations of the Skullcandy Trademarks and continued pattern of misconduct demonstrate intent to harm Skullcandy.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. § 1114

130.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.   Skullcandy is the owner of the Skullcandy Trademarks.

132.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

133.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

134.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling Skullcandy products on the Internet without the consent of Skullcandy.

135.   The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

136.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

137.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

138.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a protect bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

139.   The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

140.   The products Defendants sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

141.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

142.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

143.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

144.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers

because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty, when, in fact, they do not.

145.  Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

146.  Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

147.  Defendants' unauthorized use of the Skullcandy Trademarks has infringed upon and materially damaged the value of the Skullcandy Trademarks and caused significant damage to Skullcandy's business relationships.

148.  As a proximate result of Defendants' actions, Skullcandy has suffered and continues to suffer immediate and irreparable harm.  Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

149.   Skullcandy is entitled to recover its damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

150.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

151.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

152.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

153.   Skullcandy is the owner of the Skullcandy Trademarks.

154.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

155.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

156.   Defendants have willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling and advertising products bearings the Skullcandy Trademarks without the consent of Skullcandy.

157.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

158.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

159.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

160.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

161.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

162.   The products Defendants advertise and sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

163.  Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

164.  Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

165.  Defendants' unauthorized advertisement and sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

166.  Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality control program, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

167.   Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

168.   Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, approved by, or otherwise connected with Skullcandy when, in fact, they are not.

169.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

170.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

171.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial

172.   Skullcandy is entitled to recover their damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

173.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

174.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

### THIRD CAUSE OF ACTION
**Trademark Dilution**
**15 U.S.C. §1125(c)**

175.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

176.   Skullcandy is the owner of the Skullcandy Trademarks.

177.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

178.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

179.   For fifteen years, Skullcandy has marketed and sold products under the Skullcandy name throughout the United States.

180.   Skullcandy filed the SKULLCANDY® trademark on January 10, 2006, and it was registered on November 7, 2006.  Skullcandy has actively used and marketed products under the SKULLCANDY® trademark since that time.

181.   Skullcandy has expended substantial time, money, and resources advertising and promoting Skullcandy products with the SKULLCANDY ® trademark.

182.   Skullcandy markets, advertises, and sells products using the SKULLCANDY ® trademark throughout the United States.

183.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

184.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

185.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by

Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

186.   Skullcandy also offers the Limited Warranty for genuine Skullcandy products purchased from Authorized Dealers.

187.   Consumers recognize the SKULLCANDY® trademark as being associated with high quality headphones and speakers in the audio electronics market.

188.   The SKULLCANDY® trademark is also well known for its association with counterculture and self-expression.

189.   Because of the quality and innovation of Skullcandy products and the longevity of the use of the Skullcandy name and SKULLCANDY® trademark, consumers trust the Skullcandy name and Skullcandy products.

190.   The SKULLCANDY® Trademark is widely recognized by the general public of the United States and Skullcandy is widely recognized as the source of products bearing the Skullcandy Trademarks.

191.   The SKULLCANDY® trademark is the means by which Skullcandy products are distinguished from others in the marketplace.

192.   The SKULLCANDY® trademark is inherently distinctive, and as a result of Skullcandy's long, continuous, and exclusive use of the

SKULLCANDY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Skullcandy products.

193.   For these reasons, since at least 2016, the SKULLCANDY® trademark has been famous, distinctive, and widely recognized by the consuming public.

194.   After the SKULLCANDY® trademark became famous, in 2017, Defendants began willfully and knowingly using, and continue to use, the SKULLCANDY® trademark in commerce for purposes of selling products bearing the SKULLCANDY® trademark on the Internet without Skullcandy's consent.

195.   Defendants' willful use of the SKULLCANDY® trademark in connection with the unauthorized and illegal sale of its products dilutes the SKULLCANDY® trademark because the products Defendants sell are not subject to, and do not abide by, Skullcandy's quality controls and interfere with Skullcandy's ability to exercise control over the quality of its products.

196.   Consumers who receive poor quality products from Defendants associate that lack of quality with Skullcandy and the SKULLCANDY® trademark.

197.   Consumers who receive poor quality products submit negative online reviews disparaging Skullcandy and the SKULLCANDY® trademark.   These

negative reviews influence other consumers and cause them to become less likely to purchase Skullcandy products and trust products bearing the SKULLCANDY® trademark.

198.   As a result, Defendants' unauthorized and willful use of the SKULLCANDY® trademark has tarnished and diluted the SKULLCANDY® trademark.

199.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

200.   Skullcandy is entitled to recover their damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

201.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

202.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

## FOURTH CAUSE OF ACTION
### Common Law Trademark Infringement

203.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

204.   This claim arises under the laws of the State of Utah.

205.   Skullcandy is the owner of the Skullcandy Trademarks.

206.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

207.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

208.   The Skullcandy Trademarks are distinctive and widely recognized by the consuming public.   Skullcandy products are sold and purchased through Skullcandy's Authorized Dealers throughout the United States, including Utah.

209.   Skullcandy is widely recognized as the designated source of goods bearing the Skullcandy Trademarks.

210.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce for the purpose of selling products bearing the Skullcandy Trademarks without Skullcandy's consent.

211.   The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

212.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

213.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

214.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

215.   The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

216.   The products Defendants sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

217.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

218. Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

219. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

220. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

221. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

222. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers

because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

223.   Defendants' knowing and willful use of the Skullcandy Trademarks in connection with the unauthorized and illegal sale of products bearing the Skullcandy Trademarks without Skullcandy's consent infringes on the Skullcandy Trademarks and is contrary to honest practice in industrial and commercial matters.

224.   Defendants' unlawful actions and unauthorized use of the Skullcandy Trademarks has materially damaged the value of the Skullcandy Trademarks, caused significant damage to Skullcandy's business relations, and infringed on the Skullcandy Trademarks.

225.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

226.   Skullcandy is entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## FIFTH CAUSE OF ACTION
### Deceptive Trade Practices
### Utah Code Ann. § 13-11a-3

227.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

228.   This claim arises under the laws of the State of Utah.

229.   Skullcandy is the owner of the Skullcandy Trademarks.

230.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

231.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

232.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for purposes of advertising, promoting, and selling Skullcandy products on the Internet without Skullcandy's consent.

233.   Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

234.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

235.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

236.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

237.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

238.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

239.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

240.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

241. Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

242. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

243. Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

244. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute deceptive trade practices under Utah Code Ann. § 13-11a-3.

245. Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising

materially damages the value of the Skullcandy Trademarks and causes significant damages to Skullcandy's business relations.

246.   As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer immediate and irreparable harm.   Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

247.   Pursuant to Utah Code Ann. § 13-11a-4(2), Skullcandy is entitled to injunctive relief enjoining Defendants' infringing conduct, as well as damages, attorneys' fees, and costs.

248.   Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## SIXTH CAUSE OF ACTION
### Unfair Competition
### Utah Code Ann. § 13-5a-102

249.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

250.   This claim arises under the laws of the State of Utah.

251.   Skullcandy is the owner of the Skullcandy Trademarks.

252.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

253.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

254.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising promoting, and selling products bearing the Skullcandy Trademarks without the consent of Skullcandy.

255.   Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

256.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

257.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

258.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

259.   The products Defendants advertise, promote, and sell are not genuine Skullcandy products because the products are not authorized for sale by Skullcandy and are materially different from genuine Skullcandy products.

260.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

261.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

262.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

263.   Because the products Defendants advertise and sell bearing the Skullcandy are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

264.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

265.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

266.   Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

267.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

268.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

269.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute unfair competition under Utah Code Ann. § 13-5a-102.

270.   As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer, irreparable harm.   Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

271.   Pursuant to Utah Code Ann. § 13-5a-103(1), Skullcandy is entitled to actual damages, punitive damages, and attorneys' fees and costs.

272.   Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## SEVENTH CAUSE OF ACTION
### Tortious Interference with Contracts

273.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

274.   Skullcandy has entered into agreements with its Authorized Dealers to sell Skullcandy products.   These agreements prohibit Authorized Dealers from selling Skullcandy products to parties such as Defendants.   Specifically, the Skullcandy Rules prohibit Authorized Distributors from selling products to anyone except for Authorized Retailers.   Authorized Retailers, in turn, are permitted to sell only to End Users and are strictly prohibited from selling Skullcandy products to third parties who intend to resell the products.

275.   Defendants knew that Skullcandy's agreements with its Authorized Dealers prohibit Skullcandy's Authorized Dealers from selling Skullcandy products to parties, such as Defendants, who are not Authorized Retailers or End Users and who intend to resell the products.

276.   Defendants have been aware of these prohibitions by at least December 11, 2017, when they received Skullcandy's first cease and desist letter that explained these prohibitions.  Skullcandy also repeatedly informed Defendants of these prohibitions in the many subsequent letters it sent Defendants.

277.  Despite having knowledge of these prohibitions, Defendants knowingly and willfully interfered with the Skullcandy Rules and the agreements between Skullcandy and its Authorized Dealers by inducing Skullcandy's Authorized Dealers to breach their agreements and sell product to Defendants so that Defendants could resell them on the Internet.

278.   Defendants acted with a wrongful purpose by acquiring Skullcandy products from Authorized Dealers for the purpose of reselling those products on the Internet in violation of the Skullcandy Rules and Skullcandy's agreements with its Authorized Dealers.

279.   Defendants' actions have caused injury to Skullcandy, for which Skullcandy is entitled to compensatory damages in an amount to be proven at trial.

280.   Skullcandy is entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## PRAYER FOR RELIEF

WHEREFORE, Skullcandy prays for relief and judgment as follows:

A.   Judgment in favor of Skullcandy and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.   That a preliminary and permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)   Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Skullcandy products;

ii)   Prohibiting the Enjoined Parties from using any of the Skullcandy Trademarks in any manner, including advertising on the Internet;

iii)      Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Skullcandy products as well as any products bearing any of the Skullcandy Trademarks;

iv)      Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Skullcandy Trademarks, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Skullcandy's products, or any of the Skullcandy Trademarks;

vi)      Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Skullcandy Trademarks which associate

Skullcandy's products or the Skullcandy Trademarks with the Enjoined Parties or the Enjoined Parties' website;

vii)     Requiring the Enjoined Parties to take all action to remove unauthorized Skullcandy Trademarks from the Internet, including from www.amazon.com;

C.     An award of attorneys' fees, costs, and expenses; and

D.     Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Skullcandy demands a trial by jury on all claims and issues so triable.


Respectfully submitted,

Dated: September 19, 2018

STOEL RIVES, LLP


By:  _/s/ Monica S. Call_____
        Monica S. Call

Attorneys for Skullcandy, Inc.